IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| GRAPHIC PACKAGING INTERNATIONAL, LLC, | ) ) ) | |
| Plaintiff, | ) | C.A. No. 0:15-03476-ECT-LIB |
| v. | ) ) | |
| INLINE PACKAGING, LLC, | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFF GRAPHIC PACKAGING INTERNATIONAL, LLC'S
## <u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     INLINE'S LEGAL ANALYSIS IS DEFICIENT .................................................... 4

        A.      Totally Eliminating Features of a Design at Claim Construction is
                Improper ................................................................................................ 4

        B.      The Proper Analysis Examines the Overall Appearance of the
                Design and not Individual Elements ............................................................. 8

        C.      Inline Fails to Consider Available Alternatives to the Claimed
                Designs .................................................................................................. 9

III.    THE AVAILABILITY OF ALTERNATIVE DESIGNS CONFIRMS THAT
        THE CLAIMED DESIGNS ARE NOT DICTATED BY FUNCTION ................ 11

        A.      Alternatives for the Overall Claimed Designs ............................................ 11

        B.      Alternatives for the Individual Design Elements ........................................ 22

IV.     INLINE'S ARGUMENTS REGARDING THE OTHER CONSIDERATIONS
        ARE SPECULATIVE AND IRRELEVANT ........................................................ 42

V.      INLINE'S BRIEF IMPROPERLY ATTEMPTS TO CONVERT CLAIM
        CONSTRUCTION INTO SUMMARY JUDGMENT .......................................... 46

VI.     GRAPHIC'S CONDUCT IN OBTAINING AND ENFORCING THE
        PATENTS IS LAWFUL AND PROPER .............................................................. 47

VII.    CONCLUSION ................................................................................................ 49

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*ADC Telecommunications, Inc. v. Panduit Corp.*,
    200 F. Supp. 2d 1022 (D. Minn. 2002) .................................................................. 47

*Berry Sterling Corp. v. Pescor Plastics, Inc.,*
    122 F.3d 1452 (Fed. Cir. 1997) .................................................................. 29, 45

*Blackberry Ltd. v. Typo Prods. LLC*,
    2014 WL 1318689 (N.D. Cal. Mar. 28, 2014) .................................................................. 44

*Ethicon Endo Surgery, Inc. v. Covidien, Inc.*,
    796 F.3d 1312 (Fed. Cir. 2015) .................................................................. passim

*High Point Design LLC v. Buyers Direct, Inc.*,
    730 F.3d 1301 (Fed. Cir. 2013) .................................................................. 1, 2

*Hupp v. Siroflex of Am., Inc.*,
    122 F.3d 1456 (Fed. Cir. 1997) .................................................................. 43

*Inline Packaging, LLC v. Graphic Packaging International, LLC*,
    Civil No. 15-3183 ADM/LIB .................................................................. 3, 4, 12

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
    988 F.2d 1117 (Fed. Cir. 1993) .................................................................. 7, 9, 10

*Lyden v. adidas Am., Inc.*,
    2015 WL 758642 (D. Or. Feb. 20, 2015) .................................................................. 48

*OddzOn Prods., Inc. v. Just Toys, Inc.*,
    122 F.3d 1396 (Fed. Cir. 1997) .................................................................. 5, 7

*Richardson v. Stanley Works, Inc.*,
    597 F.3d 1288 (Fed. Cir. 2010) .................................................................. 7, 44

*Rosco, Inc. v. Mirror Lite Co.*,
    304 F.3d 1373 (Fed. Cir. 2002) .................................................................. 10

*Sports Dimension, Inc. v. Coleman Co.,*
    820 F.3d 1316 (Fed. Cir. 2016) .................................................................. passim

*Vertical Tank, Inc. v. BakerCorp*,
    2019 WL 2207668 (E.D. Cal. May 22, 2019) .................................................................. 47

*WCM Indus., Inc. v. IPS Corp.*,
2014 WL 8508559 (W.D. Tenn. Nov. 10, 2014) ....................................................4

**Other Authorities**

*Design Patent Application Guide*, U.S. PAT. & TRADEMARK OFF.,
http://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/design-patent-application-guide (last visited June 18, 2019) ...........42

Perry J. Saidman, *The Demise of the Functionality Doctrine in Design Patent Law*,
92 NOTRE DAME L. REV. 1471 (2017) ..............................................................6, 9

U.S. PAT. & TRADEMARK OFF., Manual of Patent Examining Procedure
§ 1502.01 (9th ed. 2018)..........................................................................................42

## I.      INTRODUCTION

Inline's Opening Brief[1] treats the most relevant discussion about design patent claim construction and functionality as an afterthought because it knows that there is no legal support for its arguments. In Inline's words, "[a]dmittedly, few courts have construed design patents as having 'no scope.'" Inline Op. Br. at 38. But there have been some district courts that have done so – and when challenged those decisions have been overturned by the Federal Circuit. Inline tries to find support for its argument for completely eliminating all elements of the claimed designs at claim construction in the supposed "silence" of Federal Circuit's decisions, Inline Op. Br. at 39, but the Federal Circuit's binding authority has made clear this is improper – design elements can have a functional purpose.

Even if Inline were correct in contending that the Court could issue a "no scope" construction, its approach is deficient in three respects. First, borrowing from the test used to determine whether a design patent is invalid, Inline splits the claimed designs in the Patents-in-Suit[2] into separate features and asserts that each should be eliminated because it is functional. Yet Inline fails to consider that the proper analysis focuses on the "claimed design *in its entirety*, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article." *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1315 (Fed. Cir. 2013) (emphasis added) (citations and quotations omitted).

---

[1] Dkt. No. 114 ("Inline Op. Br.").
[2] U.S. Patent Nos. D694,106, D694,124, and D727,145.

Second, Inline improperly conflates the functionality of the individual features with the functionality of the ***particular appearance*** of those features. Because "a distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function, . . . the utility of each of the various elements that comprise the design is not the relevant inquiry with respect to a design patent." *Id.* at 1316 (citations and quotations omitted). So long as the overall claimed design does not have to look the way it does to perform the intended functions of the article, it is not invalid as being dictated by that function.

Third, Inline fails to consider the availability of alternative designs found in intrinsic and extrinsic evidence for both the overall claimed designs and each of the improperly severed elements. The presence of alternatives is an "important—if not dispositive—factor in evaluating the legal functionality of a claimed design." *Ethicon Endo Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1329-30 (Fed. Cir. 2015). Ignoring alternatives is convenient for Inline, who argued in the prior *inter partes* review proceeding (where it was necessary to support its obviousness assertions) that there were a host of alternative designs that could perform the same or substantially the same functionality as the article shown in the claimed designs.

Realizing that its position is untenable, Inline attempts to distract focus from the proper analysis through express accusations that Graphic engaged in improper conduct by "stealing" the claimed inventions from Nestlé. Inline's diatribe is both procedurally improper and completely inaccurate. The issue before this Court is claim construction,

where the Court will determine the meaning of the drawings based primarily on intrinsic evidence. Inline attempts to convert this to summary judgment by asking the Court to delve into volumes of extrinsic evidence, including inventorship, Nestlé's reasons for choosing Graphic to produce embodiments of the articles depicted in the Patents-in-Suit, and external commercial considerations, like pricing, manufacturing, and distribution costs. In addition to being wholly speculative and unsupported, none of this bears on the scope of the claimed designs and goes far beyond what should be considered at the claim construction stage.

Inline's denunciation of Graphic's conduct in applying for and receiving the Patents-in-Suit is especially surprising given that Judge Montgomery has already rejected Inline's theories, granting Graphic summary judgment on all of Inline's claims in the Antitrust Case, including that Graphic procured the patents through fraud by failing to name someone at Nestlé as a co-inventor.[3] Putting aside that "co-inventorship" is different than "stealing" – and Inline was unable to convince the Court that there was even a triable issue on *co-inventorship* in the antitrust case, but inexplicably now asserts that *someone at Nestle should be the sole inventor* – Inline's invective detracts from the appropriate analysis and should be ignored.

Because Inline's proposed constructions invite legal error, Graphic submits that the claims of the Patents-in-Suit should be construed as the overall visual impression depicted in the drawings.

---

[3] *Memorandum Opinion and Order*, Dkt. No. 1035, at 18-25 (*Inline Packaging, LLC v. Graphic Packaging International, LLC*, Civil No. 15-3183 ADM/LIB) ("Antitrust Case"). Inline has appealed this decision to the Eighth Circuit.

## II.     INLINE'S LEGAL ANALYSIS IS DEFICIENT

Inline's entire approach to claim construction is flawed because it flows from an incorrect application of the law.

### A.     Totally Eliminating Features of a Design at Claim Construction is Improper

Inline readily admits that there is not support for its proposed construction of "no scope."  Inline Op. Br. at 38.[4]  And although Inline discusses pertinent Federal Circuit case law, it contends that this precedent leaves room for excluding individual features of the Patents-in-Suit because they have some functions.  *Id*. at 39.  This is incorrect; in the *Ethicon* and *Sports Dimension* cases, the Federal Circuit made clear that even functional elements must be considered as part of the visual appearance of the overall claimed design.  To the extent anything needs to be factored out at claim construction, it is only when a patentee has proposed constructions that include broad, general design concepts – and not the appearance of the claimed designs as specifically shown in the drawings.  Graphic's proposed construction is limited to the actual drawings, negating the need for any exclusion.

In *Ethicon*, the design patents at issue claimed the visual appearance of an ultrasonic surgical device comprised of various combinations and relative positions of a

---

[4] Inline cites to one unpublished opinion that construed several design patents as having no scope.  *WCM Indus., Inc. v. IPS Corp.*, 2014 WL 8508559, at *50-51 (W.D. Tenn. Nov. 10, 2014).  That decision was not appealed to the Federal Circuit and was issued prior to the recent seminal decisions on functionality and claim construction addressed herein.  Respectfully, the court also appears to have employed a test that is contrary to precedent by requiring the patent owner to show that there were "aspects of the claimed designs . . . dictated by ***ornamental*** considerations."  *Id*. at 51 (emphasis added).

U-shaped trigger, a fluted torque knob, and a rounded activation button. *Ethicon*, 796 F.3d at 1327. The district court held that the trigger, torque knob, and button were "based on functional considerations" and construed the patents "to encompass 'nothing,' factoring out and removing every element from the scope of the claimed design." *Id*. at 1332-33.

The Federal Circuit reversed, first reviewing its design patent claim construction jurisprudence related to functionality, and summarizing it as limiting claim scope to "the ornamental aspects of the design, and . . . not . . . '*the broader general design concept*.'" *Id*. at 1333 (quoting *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)) (emphasis added). Next, the *Ethicon* court examined *OddzOn*, which involved the visual appearance of a design for a football-shaped ball with a tail and fin structure. *Id*. The Federal Circuit approved of the lower court's construction that did not include "the *general design concept* of a football with tails and fins," but did include what those elements looked like in the claims, including the shape, number, and arrangement of the tails and fins. *Id*. at 1334 (emphasis added).

Applying this, the Federal Circuit held that the district court improperly ignored the particular appearance of the functional features in its "no scope" construction: "although the Design Patents do not protect the *general design concept* of an open trigger, torque knob, and activation button in a particular configuration, they nevertheless have some scope—the particular ornamental designs of those underlying elements." *Id*. at 1334 (emphasis added). Later, when determining infringement, the Federal Circuit confirmed that a proper construction does not include broad underlying concepts at a

"general conceptual level;" it should only include the overall visual appearance of the actual design. *Id*. at 1336.

Soon after, the Federal Circuit reaffirmed this approach in *Sports Dimension, Inc. v. Coleman Co.* The design in *Sports Dimension* depicted a flotation device with armbands and a tapered side torso:



820 F.3d 1316, 1318 (Fed. Cir. 2016) (depicting FIGs. 1 and 2 of the patent). Like Inline's proposed constructions, the district court's claim construction eliminated the armbands and the tapered side torso in their entirety. *Id*. at 1321.

Looking at several factors, including that the claimed designs were the "best designs," a co-pending utility patent disclosing the armbands and torso tapering and touting their utility, and advertising promoting the particular usefulness of the armbands and tapered torso, the Federal Circuit agreed with the district court's findings that the armbands and tapered torso were functional. *Id*. at 1321. Yet the Federal Circuit rejected the district court's construction eliminating those elements entirely as "contrary to our law." *Id*. at 1322.

In summarizing its prior cases, the Federal Circuit stated:

> In *OddzOn*, *Richardson*, and *Ethicon*, we construed design patent claims so as to assist a finder of fact in distinguishing between functional and ornamental features. ***But in no case did we entirely eliminate a structural element from the claimed ornamental design, even though that element also served a functional purpose***.

*Id*. at 1321 (emphasis added).

In a recent article published in the Notre Dame Law Review regarding design patents and functionality, the practitioner summed up the holdings in *Ethicon* and *Sports Dimension* as follows:

> The Federal Circuit solidified its thinking from *Richardson*, namely that ***it is only the broad underlying concepts that cannot be protected*** – i.e., need to be "factored out" of a design patent claim – in order to avoid using the design patent as a utility patent. One is always left with the appearance aspects of those same utilitarian features to compare to the accused product in determining infringement.

Perry J. Saidman, *The Demise of the Functionality Doctrine in Design Patent Law*, 92 NOTRE DAME L. REV. 1471, 1478 (2017) (emphasis added) (citations and quotations omitted).[5]  This makes sense; the Federal Circuit has long appreciated that because a design patent must claim an article of manufacture, which "necessarily serves a utilitarian purpose," its design elements will also have underlying functionality.  *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993); *see also* SJA Exhibit M, *Demise of Functionality*, 92 NOTRE DAME L. REV. at 1479:

> All designs by their very nature include utilitarian features, the presence of which does not disqualify the design from being protected by a design patent. Such utilitarian features are not protected as utilitarian features. Rather, it is the design, the associated appearance, of those utilitarian

---

[5] Attached hereto as SJA Exhibit M.  Unless otherwise noted, all references to "SJA Exhibit __" refer to the exhibits in the Supplemental Joint Appendix.

features that are properly protected by a design patent and are to be compared to an accused product when analyzing infringement.

Graphic's proposed constructions – specifically limited to the visual appearance of the drawings – do not attempt to claim any general design concepts that have an underlying functionality, such as all blanks or constructs having main panels, gussets, apertures, and a closing feature. This construction accords with Federal Circuit precedent; Inline seeks to contravene controlling case law by seeking to wholly eliminate elements of the claimed designs.

**B. The Proper Analysis Examines the Overall Appearance of the Design and not Individual Elements**

In attempting to assert that the Graphic Patents improperly claim functional designs, Inline divides the drawings into seven individual elements. Inline Op. Br. at 13-14. Inline's arguments about the functionality of each feature are incorrect, as discussed below. But even without wading through volumes of extrinsic evidence it has cited, Inline's position is lacking from the outset because it fails to include any discussion of the claimed designs **as a whole**. In other words, even if Inline was correct about the separate elements, do they have to appear the way they do when combined into the overall design in order for the article to function? Inline's failure to even address, let alone answer this question should result in a rejection of its proposed constructions.

The Federal Circuit has made clear that "design patents protect the overall ornamentation of a design, not an aggregation of separable elements." *Sports Dimension*, 820 F.3d at 1322. As a result, severing a claimed design into separate elements "improperly convert[s] the claim scope of the design patent from one that covers the

overall ornamentation to one that covers individual elements." *Id*.; *see also Ethicon*, 796 F.3d at 1329 ("We have also instructed that the overall appearance of the article—the claimed design viewed in its entirety—is the basis of the relevant inquiry, not the functionality of elements of the claimed design viewed in isolation."); *L.A. Gear*, 988 F.2d at 1123 ("the utility of each of the various elements that comprise the design is not the relevant inquiry with respect to a design patent" because the determination of whether a design is dictated by function requires looking at the design "in its entirety").

Using its incorrect approach, Inline criticizes Graphic for not identifying separate elements in the claimed designs. Inline Op. Br. at 12-13, 43. But following Federal Circuit precedent, Graphic's position is that each of the elements contributes to the overall visual impression (or ornamentation) of the claimed designs. *Id*. at 12 (citing Graphic's interrogatory response). Inline's failure to do the same in contending that the individual design features are functional prevents it from meeting its burden to show that the Patents-in-Suit are dictated by function.

### C. Inline Fails to Consider Available Alternatives to the Claimed Designs

Inline further ignores the principal factor in determining whether a design is dictated by function: whether there are available alternatives to the claimed designs. Inline gives passing reference to the fact that Nestlé chose a certain design over others but fails to explain whether those alternatives could have performed essentially the same functionality. Inline Op. Br. at 14. Instead, Inline looks to secondary and extraneous considerations, like whether the general design concepts are the "best design" because they offer production efficiencies and are low cost, whether there are utility patents

claiming the same designs, and whether there has been promotion of the functionality of the design. Inline Op. Br. at 14.

In addition to being unsupported and speculative (addressed below), Inline's failure to examine whether there are alternative designs that can perform the same or substantially the same functions is fatal to its proposed constructions. The presence of alternative designs is "an important – if not dispositive – factor in evaluating the legal functionality of a claimed design." *Ethicon*, 796 F.3d at 1329-30 (citing *L.A. Gear*, 988 F.2d at 1123 ("[w]hen there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose"); *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002) ("[I]f other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional.")).

Considerations other than alternatives only come into play "where the existence of alternative designs is not dispositive" of the inquiry. *Ethicon*, 796 F.3d at 1330. Other factors "***can*** provide useful guidance, [but] an inquiry into whether a claimed design is primarily functional should begin with an inquiry into the existence of alternative designs." *Id.* (emphasis added); *see also* SJA Exhibit M, *Demise of Functionality*, 92 NOTRE DAME L. REV. at 1472 ("the go-to validity test for functionality is whether there are alternative designs to the one claimed in the design patent-in-suit that perform substantially the same function; if there are, the design patent is said not to monopolize that function").

The lack of discussion regarding alternatives is particularly significant given their general availability in both the intrinsic and extrinsic record – including Inline's own prior statements about the functionality of prior art designs. Inline's proposed constructions should be rejected because these alternatives were not addressed.

## III. THE AVAILABILITY OF ALTERNATIVE DESIGNS CONFIRMS THAT THE CLAIMED DESIGNS ARE NOT DICTATED BY FUNCTION

Inline is wrong on the law, but it also ignores overwhelming evidence that the claimed designs are not, in fact, dictated by function.

### A. Alternatives for the Overall Claimed Designs

The bar for qualification as an alternative is low. "[T]o be considered an alternative, the alternative design must simply provide the same or similar functional capabilities." *Ethicon*, 796 F.3d at 1331 (citations and quotations omitted). The intrinsic record and the general availability of alternative designs make clear that the claimed designs do not have to look the way they do to perform the underlying functions of heating, carrying, and accessing a food product.

Specifically, Graphic identified numerous alternative designs in the intrinsic record in its Opening Brief. Dkt. 112 at 15-24. The general availability of alternative designs that may have the same or substantially the same underlying functionality as the overall claimed designs is dispositive.

Inline itself has previously touted these alternatives in direct contradiction of its present claims that the Patents-in-Suit are dictated by function. In an *inter partes* review proceeding before the U.S. Patent and Trademark Office, Inline challenged the validity of

U.S. Patent No. 8,872,078 ("the '078 Patent"),[6] which Graphic owned and which shares priority with the Patents-in-Suit.[7]  In successfully arguing to the PTO that the '078 Patent is invalid, Inline and its expert, Dr. Claire Koelsch Sand – who is opining again on Inline's behalf – put forth numerous prior art references disclosing alternative designs that they argued achieve all of the underlying heating, carrying, and accessing functionality of the articles shown in the Patents-in-Suit.   SJA Exhibit N, Inline's Corrected IPR Petition at 6-8.

Inline and Dr. Sand included many references in the '078 IPR, but Dr. Sand focused her opinions on Japanese Pub. No. JP2002-347756 ("*Kato*"), U.S. Patent No. 4,948,932 ("*Clough*"), U.S. Pub. No. 2003/0206997 (*Winkelman*), U.S. Pub. No. 2004/0023000 ("*Young*"), and U.S. Pub. No. 2004/0101605 ("*Sigel*").

In asserting that these references invalidated the '078 Patent, Dr. Sand opined that they disclose packaging with the same or substantially the same heating, carrying, and accessing functionality underlying the claimed designs in the Patents-in-Suit.  Yet these references also disclose design alternatives for packages that can also perform these or essentially the same functions.  Floros Resp. Decl. ¶¶29-30.

---

[6] The '078 Patent is a utility patent in the same family with the Patents-in-Suit that generally claims blanks and constructs for heating, carrying, and accessing a food item. JA821, '078 Patent at Abstract.  Because it is a utility patent, the '078 Patent claims physical packaging with this functionality; the Patents-in-Suit are limited visual design impressions of packaging.  Floros Resp. Decl. ¶28.
[7] *Inline Packaging, LLC v. Graphic Packaging International, Inc.*, Patent Trial and Appeal Board, IPR2015-01609 ("the '078 IPR").

The first of these is *Kato*,[8] which portrays designs that offer visual alternatives to the overall impressions of the claimed designs. Floros Resp. Decl. ¶81. A chart comparing some of the drawings in *Kato* to drawings from similar perspectives in the Patents-in-Suit is below:

| Graphic Patent Figure | Kato Figure |
|---|---|
| '106 Patent | |



---

[8] JA1174-84.

| Graphic Patent Figure | Kato Figure |
|---|---|
| <u>'124 Patent</u> | |



In the '078 IPR, Dr. Sand opined that *Kato* discloses every element of claim 1 of the '078 Patent, with the exception of the use of microwave susceptor material.[9] JA253, Exhibit 10, Declaration of Claire Koelsch Sand PH.D, dated July 21, 2015 ("Sand IPR Decl.") ¶102. Dr. Sand testified that *Kato* was very well-suited to provide the desired functionality of heating, carrying, and accessing a food item. SJA Exhibit O, 03/16/2016 Dep. of Claire Koelsch Sand, at 37:16 – 38:6, 39:5 – 41:1, 102:2-15, 107:8-12; SJA Exhibit P, 08/04/2016 Deposition of Claire Koelsch Sand, at 55:19 – 56:14. Dr. Sand's opinions confirm that *Kato* presents alternatives to the claimed designs that could perform essentially the same functions.

---

[9] The Patents-in-Suit do not claim the use of microwave susceptor material or any other type of material.

Dr. Sand presented similar opinions about *Sigel*[10], claiming that it "mirror[s] the '078 patent disclosure" and is capable of performing the same or substantially the same heating, carrying, and accessing functionality underlying the drawings in the Patents-in-Suit. JA516-18, Exhibit 10, Sand IPR Decl., ¶¶66-67. Below is a chart comparing some of the drawings in *Sigel* to the drawings in the Patents-in-Suit from similar perspectives.



| Graphic Patent Figure | Sigel Figure |
|---|---|
| '106 Patent |  |
| '145 Patent |  |

| Graphic Patent Figure | Sigel Figure |
|---|---|
| '124 Patent  FIG. 9 |  FIG. 2 |

As is evident, the drawings in *Sigel* offer visual alternatives to the overall visual impressions of the claimed designs. Floros Resp. Decl. ¶83.

The same is true regarding Dr. Sand's opinions about *Winkelman*,[11] which also offers alternative designs to the claimed designs. Floros Resp. Decl. ¶85. A chart comparing some of the drawings in *Winkelman* to drawings from similar perspectives in the Patents-in-Suit is below:

[11] JA1111-25.



| Graphic Patent Figure | Winkelman Figure |
|---|---|
| ‘106 Patent | |
| ‘145 Patent | |
| ‘124 Patent | |

Despite its alternative design, Dr. Sand opined that *Winkelman* is capable of performing the same or substantially the same heating, carrying, and accessing functionality underlying the drawings in the Graphic Patents.  JA522-24, Exhibit 10, Sand IPR Decl., ¶¶81-84.

The availability of *Kato*, *Sigel*, and *Winkelman* confirms that the overall visual appearance of the claimed designs is not dictated by function. Floros Resp. Decl. ¶80. Inline's assertions otherwise contradict and are inconsistent with its prior arguments in the '078 IPR regarding the functions that these alternatives can perform.

Similarly, even though *Clough*[12] and *Young*[13] do not depict a closing feature, according to Dr. Sand the references also represent alternatives that are capable of achieving the same functions as the article displayed in the Patents-in-Suit.

Dr. Sand opined that *Young* "is substantially identical to those features as configured in embodiments in the '078 Patent" and is capable of performing the same or substantially the same heating, carrying, and accessing functionality underlying the drawings in the Patents-in-Suit. JA519-21, Exhibit 10, Sand IPR Decl., ¶¶73-78. And despite not portraying this feature in the drawings, Dr. Sand stated that *Young* disclosed the use of a lid on the end of Figure 10J that is not shown, providing a closed end to contain or hold a food product. JA521, Exhibit 10, Sand IPR Decl., ¶¶77-78. Below is a chart comparing some of the drawings in *Young* to drawings from similar perspectives in the Patents-in-Suit:

---

[12] JA1105-10.
[13] JA1126-48.

| Graphic Patent Figure | Young Figure |
|---|---|
| **'106 Patent**<br><br><br>**'145 Patent**<br> |  |

---

| Graphic Patent Figure | Young Figure |
|---|---|



Finally, below is a chart comparing some of the drawings in *Clough* to drawings from similar perspectives in the Patents-in-Suit:[15]

---

[15] *Clough* does not depict a blank, so no comparison is made to the '106 or '145 Patents.

20

| '124 Patent Figure | Clough Figure |
|---|---|



Dr. Sand opined that *Clough*, too, is capable of performing the same or substantially the same heating and accessing functionality underlying the drawings in the Graphic Patents. JA529, Exhibit 10, Sand IPR Decl., ¶89.

Given these prior contentions, Inline should not be permitted now to reverse course and claim that there are not alternative designs that can perform the same or substantially the same functions as the articles portrayed in the Patents-in-Suit.

**B.    Alternatives for the Individual Design Elements**

Though it is unnecessary to discuss alternatives for the individual design elements, there are also many available design alternatives for each feature that Inline has separated from the overall claimed designs, confirming that none of these elements is dictated by function.

In fact, Dr. Sand seems to concede this point in her discussion of the individual elements. Although she states in the "General Opinions" section of her Declaration that the individual design elements are dictated by function, Dr. Sand fails to actually conclude that the features must look like they do in the drawings in order to achieve the underlying functions of heating, carrying, and accessing food items. Instead, she simply opines that there are elements that have some utility that should be considered, confirming that Inline did not contemplate the possibility of available alternatives.

When discussing the purported benefits that each of the separate features purportedly contribute, Dr. Sand uses only equivocal and qualified language. As one example, in her opinions regarding gussets she opines that: "more material ***might*** be required;" "added material would be ***typically*** in the form of increased thickness;" "the

sleeve would not fold *in as compact* a manner;" and "result in *less* uniform crisping and *increased* chance of error by consumers."  Dkt. No. 116, Sand Declaration ¶¶14(c)-(e). Dr. Sand utilizes similar vague descriptors throughout her declaration.  *Id*. ¶¶14(g)-(h), 15(d)-(l), 16(b), 16(d), 17, 18(d)-(e).

By using these equivocal terms, Dr. Sand indicates that the alleged benefits are merely incremental, such that they do not materially impact the package's ability to carry out the heating, carrying, and accessing a food product functions, providing for the availability of alternatives presented above.  Floros Resp. Decl. ¶¶21-25.

Notwithstanding, Inline (improperly) split the Patents-in-Suit into six different elements,[16] and alternatives to each are addressed below.

### i.    Gussets/Minor Panels

Inline contends in broad terms that gussets and minor panels serve the functions of creating tension and a space for the food product.  Inline Op. Br. at 15-21.  Yet Inline fails to consider whether there are alternative designs that can perform the same or similar functions – of which there are many.

Such alternatives include gussets with side creases at different locations other than the middle of the minor panel, as well as side creases that fold outwardly as opposed to the inward folding creases in the claimed designs.  Floros Resp. Decl. ¶¶35-36, 38.  There are also alternatives that could include more than one crease line on the minor panels, such as in multiple gusset, pleat, or accordion-style packaging.  *Id*. ¶37.  In fact, U.S.

---

[16] Inline also lists a "tear strip and cut-out," but as Inline acknowledges, those features are not claimed in the Patents-in-Suit.  Inline Op. Br. at 14-15.  Regardless, various alternative designs appear in the following discussion.

Patent No. 8,013,280, which is owned by Graphic and directed to packaging for heating, carrying, and accessing food products, expressly acknowledges that multiple gussets can be used in these applications. *Id.*; SJA Exhibit Q, U.S. Patent No. 8,013,280 at 5:29-32.

Pleated or accordion-style cartons and packaging with multiple creases are common and offer visual alternatives to the single crease line in the middle of the minor panels in the claimed designs. Below are a few examples:



Floros Resp. Decl. ¶37.

Inline's own brief acknowledges the availability of an outward folding gusset, as opposed to the inward folding gussets in the claimed designs. Inline Op. Br. at 16-18; Floros Resp. Decl. ¶38. *Clough* and *Pawlowski* display examples of an outward folding crease line:

---

[17] SJA Exhibit R.
[18] SJA Exhibit S.

| Clough[19] | Pawlowski[20] |
|---|---|



Floros Resp. Decl. ¶38. In her opinions in the '078 IPR, Dr. Sand also recognized the outward folding gussets of *Clough* and *Pawlowski* as available alternatives. JA638-39, Exhibit 11, Declaration of Claire Koelsch Sand PH.D, dated June 30, 2016 ("Sand IPR Rebuttal Decl."), ¶¶58-60.

ii. **Apertures**

Inline again fails to address whether there are alternatives to the apertures in the claimed designs that could perform the same or substantially the same underlying functions. Inline asserts that apertures in general assist with even cooking and venting moisture, Inline Op. Br. at 21-22, and there are many different designs that can achieve the same or essentially the same functionality.

An aperture of a different shape – such as a square or rectangular shaped aperture – is capable of providing the same or substantially the same functionality. Floros Resp. Decl. ¶¶42-46. The '078 Patent states that the aperture "number, shape, size, and

---

19 JA1105-10.
20 U.S. Patent No. 4,775,771 ("*Pawlowski*"), JA1094-1104.

25

positioning of such apertures may vary for a particular application." JA843, '078 Patent at 4:56-60.[21]  In the '078 IPR, Dr. Sand agreed, acknowledging that *Clough* discloses that aperture size can be altered during the design process.  JA623-24 Exhibit 11, Sand IPR Rebuttal Decl., ¶30.  Examples of alternative designs for apertures that can achieve the same or similar functionality are below:



| <u>Young</u>[22] | <u>Winkelman</u>[23] |
| --- | --- |

---

[21] Inline contends that the '078 Patent describes "substantially circular" apertures as the "best design," but the patent does not make this claim.  Inline Op. Br. at 23-24.  As discussed, it expressly acknowledges that there are many other options besides "substantially circular designs."  Indeed, the '078 Patent's claims do not claim the use of a circular aperture – just an "aperture."  JA852-86, '078 Patent at Claims 3, 13, 23, 38, 41, 46, and 53.
[22] JA521-22, Exhibit 10, Sand IPR Decl., ¶79; JA1136, *Young* at FIG 10L.
[23] JA1117, *Winkelman* at FIG 6.



[24] JA1223, Exhibit E at FIG 8.
[25] JA1263, Exhibit F at FIG 11B.
[26] JA1333, Exhibit D at FIG 1A.



| U.S. Patent No. 6,683,289[27] | U.S. Patent No. 4,592,914[28] |

Floros Resp. Decl. ¶¶47-48.

### iii. Main Panels

As to the main panels, Inline contends that they facilitate the functions of holding and accessing a food product. Inline Op. Br. at 25-27. Inline represents that non-rectangular shapes would be unacceptable because it would not mirror the shape of a Hot Pocket, but the evidence it cites does not support this claim. *Id.* at 26.

The first cite is to Dr. Floros' declaration from the '078 IPR, which simply states that a panel with a second direction substantially perpendicular to a first direction – as claimed in the '078 Patent – is useful in evenly heating a food product using microwave interactive material. JA38-39. But the Patents-in-Suit do not claim microwave interactive material or a particular size for use with a particular food product (i.e., tailored to the size of a Hot Pocket). Floros Resp. Decl. ¶53-54. Nor would it be proper to take things like height, volume, and dimensions related to a commercial product into

<hr>

[27] JA1395-96, Exhibit I at FIGs 9A and 10A.
[28] SJA Exhibit T, at FIG 12.

consideration; the Federal Circuit has long rejected attempts to argue that alternatives are not available because they do not meet the specifications of a commercial embodiment of a claimed design.  *See Berry Sterling Corp. v. Pescor Plastics, Inc.,* 122 F.3d 1452, 1455 (Fed. Cir. 1997) (reversing functionality finding, stating that the district court "should address the article in the claimed design, which means, realistically, the article and its configuration as shown in the drawings. Thus, we vacate and remand because the court cannot use the limitations of the commercial embodiment of the underlying article of manufacture to impose limitations on the scope of the design patent.").

In fact, commercial products embodying the designs in the Patents-in-Suit have been used in connection with differently shaped and sized foods, like spring rolls.  SJA Exhibit U, Graphic's Amended Preliminary Infringement Contentions at 2-3.   And having a perpendicular second direction would not exclude other designs, shown in the chart below, that have straight edges that are also perpendicular, such as a square, polygon, or some combination of the two.

Nor does the '078 Patent claim that non-rectangular designs would be unsuitable to perform the underlying functions.  Inline's Op. Br. at 26.  The patent makes clear that numerous shapes may be used, including "polygons, circles, ovals, cylinders, prisms, spheres, polyhedrons, and ellipsoids."  JA851, '078 Patent at 20:46-53.  While Inline does not discuss the necessity of three main panels, it is evident that different numbers of main panels may be used to achieve the underlying heating, carrying, and accessing functions.  Floros Resp. Decl. ¶55-56.

Numerous available design alternatives are shown below:



| Winkelman[29] | U.S. Pub. No. 2006/0096978[30] |
|---|---|
| FIG. 6 | Fig. 8 |

| U.S. Patent No. 8,063,344[31] | U.S. Patent No. 8,061,265[32] |
|---|---|
| FIG. 11B | FIG. 1A |

[29] JA1117, *Winkelman* at FIG 6.
[30] JA1223, Exhibit E at FIG 8.
[31] JA1263, Exhibit F at FIG 11B.
[32] JA1333, Exhibit D at FIG 1A.



| U.S. Patent No. 6,683,289[33] | U.S. Patent No. 6,877,634[34] |
|---|---|
| FIG. 9A   FIG. 10A | FIG. 8A |
| U.S. Patent No. 4,592,914[35] | Kato[36] |
| FIG. 12. | FIG. 3 |

[33] JA1395-96, Exhibit I at FIGs 9A and 10A.

[34] JA1299, Exhibit B at FIG 8A.

[35] SJA Exhibit T, at FIG 12.

[36] JA1178, 1183, *Kato* at FIG 3.



| Sigel[37] | U.S. Patent No. 4,626,641[38] |
|-----------|-------------------------------|

Floros Resp. Decl. ¶55.

    **iv.    Seam**

    Regarding the seam, Inline represents that it needs to be located in the middle of the bottom or back main panel in order to avoid adverse effects on heating and to provide structural support.  Inline Op. Br. at 29-30.  But there are alternative designs that show the seam at different locations than the seam in the claimed designs.  In addition to those cited in Graphic's Opening Brief, Dkt. No. 112 at 15-24,[39] additional alternatives are shown below:

---

[37] JA1152, *Sigel* at FIG 7.
[38] SJA Exhibit V, at FIG 2.
[39] Some of these do not show the particular location of the seam in a fully constructed package, but as Dr. Sand states it is "conceivable that the seam could be placed at the intersection of a minor panel and main panel.  In such a configuration, there would be two main panels and two minor panels to a sleeve blank."  Dkt. No. 116, Sand Decl. ¶17(d); *see also* Floros Resp. Decl. ¶62.



| Sigel[40] | Kato[41] |
|-----------|----------|

Floros Resp. Decl. ¶62. Dr. Sand appears to have agreed with the availability of alternatives in the '078 IPR, stating that "[w]hile *Kato* provides an illustration of a blank having a seam on the side wall, nothing in *Kato* indicates that placement of the seam on the side wall is anything other than a matter of ***simple design choice, rather than a matter of functionality***." JA557-58, Exhibit 10, Sand IPR Decl., ¶154 (emphasis added).

v.   **End Panels**

According to Inline, the function of the end panels is to assist in forming the pillow pack shape, which purportedly facilitates the holding and carrying of a food product. Inline Op. Br. at 32-33. Following Inline's logic, because these supposed benefits are generally applicable, any end panels capable of contributing to a pillow pack

---

[40] JA1151, *Sigel* at FIG 5 (annotated).
[41] JA1178, 1183, *Kato* at FIG 5 (annotated).

shape are conceivable alternatives to the visual appearance of the end panels in the claimed designs, such as alternatives with varying degrees of curvature and arc length at the ends. Floros Resp. Decl. ¶63.

Inline offers no support – nor could it – for an argument that the end panels in the claimed designs are the only designs that could perform the underlying function of forming a pillow pack or otherwise forming a package that can hold and carry a food product. *Id.* ¶¶64-68, 71. Inline ignores the presence of alternative designs, including those with a different number of end panels.

Nor is there anything other than unsupported arguments and opinions that the length of the end panels is "optimized." *Id.* ¶69. As long as the end panels are designed to allow the tab to connect with the slit, the closing feature will perform the intended function. *Id.* There are numerous available alternative end panel designs that can perform the holding and carrying functionality that Inline identifies, some examples are below:



| U.S. Pub. No. 2010/0193509[42] | Winkelman[43] |
|---|---|
| FIG. 1A | FIG. 6 |
| U.S. Pub. No. 2006/0096978[44] | Kato[45] |
| *Fig. 8* | FIG. 3 |
| *Fig. 11* | |

[42] JA1309, Exhibit C at FIG 1A.

[43] JA1117, *Winkelman* at FIG 6.

[44] JA1223, 1225, Exhibit E at FIGs 8 and 11.

[45] JA1178, 1183, *Kato* at FIG 3.

Sigel[46]



FIG. 7

Floros Resp. Decl. ¶71.

### vi. Tab and Slot

The last inappropriately separated element is the "tab and slot," which Inline asserts also contributes to the holding and carrying functions underlying the claimed designs because it keeps the food item from falling out of the bottom. Inline Op. Br. at 35-36. Yet Inline does not – and cannot – attribute these benefits to the particular design of the t-shaped slit and trapezoidal tab that the Patents-in-Suit actually portray. *Id.* The only unsuitable alternatives are those that would "likely allow the food to fall out of the bottom," leaving room for any closing feature that contained the food product as a viable alternative. *Id.* at 36.

Inline suggests that alternative designs were rejected before arriving at the t-shaped slit and trapezoidal tab design (Inline Op. Br. at 35-36), but the evidence it cites

---

[46] JA1152, *Sigel* at FIG 7.

does not support this statement. For example, there is no indication that the alternative concept shown in Exhibit 23 was not ultimately chosen because it lacked a t-shaped slit and trapezoidal tab. Nor is there any indication that only these two elements could succeed in "keeping the bottom closed" in response to the consumer testing; the testing showed that consumers struggled from a lack of instruction in how to close the bottom – and not necessarily from an inability of alternatives to perform the closing function. JA731-32, Exhibit 27 at 6-7.

In addition, neither the consumer testing nor Mr. Voyzey's declaration show that the "particularly-sized-and-located trapezoidal tab" was the exclusive means to keep the bottom closed. JA731, Exhibit 27 at 6 (consumer testing mentioning merely a "slit"); JA228, Exhibit 5 ¶29 (discussing a "tab feature"). Inline makes passing mention to optimizing the angle of the side edges of a tab but fails to explain how this is germane to the appearance of the designs in the Patents-in-Suit.

The only discussion tied to the actual appearance or location of the t-shaped slit and trapezoidal tab in the claimed designs is limited to: (1) how the t-shaped slit and trapezoidal tab work together, and (2) how increased thickness or dimension in the paperboard would be required if the location was different. Inline Op. Br. at 35-36. Regarding the first, the fact that a t-shaped slit and trapezoidal tab can work together does not preclude the use of other designs that also work together. Floros Resp. Decl. ¶75. As to the second, Inline does not explain: (1) what type of location change would necessitate increased thickness or dimensions, or (2) why the locations could not be different but still close the bottom so long as the tab and slit could connect together. *Id.* ¶¶72, 74.

The existence of alternative closing feature designs confirms that the appearance of the t-shaped slit and trapezoidal tab in the Patents-in-Suit are not dictated by function. The '078 Patent does discuss a t-shaped slit and trapezoidal tab, but it also claims general alternatives like a "cut" and "tab" (Claim 1), a "cut" and "projection" (Claim 20), and a "slit" and "locking feature" (Claim 29). JA852-54, '078 Patent at 22:42-47, 24:42-49, 25:64 – 26:6.

Here again, Inline contradicts its previous position in the '078 IPR, where Dr. Sand discussed alternative designs for a slit that can provide essentially the same functionality as the closing features in the Patents-in-Suit, shown below:[47]



---

[47] JA Exhibit 11, Sand IPR Rebuttal Decl., ¶34 (citing U.S. Pub. No. 2013/0121624, Fig. 52 and [0175]; U.S. Patent No. 8,353,398, Fig. 1A and 4:10-15; U.S. Patent No. 7,658,317, Fig. 9 and 4:13-23; U.S. Patent No. 5,020,717 Fig. 1 and 2:32-41).



Dr. Sand also testified that *Young* discloses an end closure because it discusses the use of flaps to partially close the end, even though it does not include a tab and slot feature. SJA Exhibit O, 03/16/2016 Deposition of Claire Koelsch Sand, at 172:23 -173:3.

There are numerous other closing features that represent alternatives to the claimed designs but could achieve the same or substantially the same functions:



48

---

48 SJA Exhibit W, GPIPAT_00002425.



U.S. Pub. No. 2006/0096978[49]

**Fig. 8**

**Fig. 11**

Winkelman[50]

FIG. 6

U.S. Patent No. 5,078,273[51]

FIG.1

U.S. Patent No. 4,626,641[52]

FIG. 2.

[49] JA1223, 1225, Exhibit E at FIGs 8 and 11.
[50] JA1117, *Winkelman* at FIG 6.
[51] JA1448, Exhibit L at FIG 1.
[52] SJA Exhibit V, at FIG 2.



‘364 Application[53]

FIG.2A

FIG.1A

Floros Resp. Decl. ¶78.

These alternatives confirm that the claimed designs are not dictated by function.

*Id.* ¶79.

## IV. INLINE'S ARGUMENTS REGARDING THE OTHER CONSIDERATIONS ARE SPECULATIVE AND IRRELEVANT

In overlooking the abundance of available alternatives, Inline largely focuses on

other considerations that are irrelevant, based on speculation, and discussed at too high a

level of abstraction. For example, Inline relies heavily on the fact that Nestlé ultimately

---

[53] JA1243, 1245, Exhibit A at FIGs 1A and 2A.

chose Graphic to produce the commercial embodiment of the sleeves shown in the Patents-in-Suit to assert it is the "best design." Inline Op. Br. at 6-8, 14. Apparently, it is the "best design" because it satisfied Nestlé's goals of finding a "***unique***, functional design" that could heat, transport, and facilitate consumer access a food product. *Id*. at 6-7 (emphasis added). Inline's Brief omits the comma after unique, which indicates that Nestlé desired a functional ***and*** unique design – not just a unique functional design. JA703, Exhibit 24 at 3.

Nestlé's ultimate decision to go with a package that was capable of achieving certain desired functionality in general terms does not mean that Nestlé chose the sleeve because the particular appearance of the claimed designs in the Patents-in-Suit were the only or even the preferred way to perform these functions. For instance, there is no evidence that Nestlé picked the designs because they had a specific t-shaped slit and trapezoidal tab or gussets with creases in the middle of the minor panels – or because those were the "best designs" to achieve the desired functions. Inline has done nothing more than contend that the articles in the Patents-in-Suit perform a function that satisfied Nestlé, a characteristic which is a "prerequisite of design patentability, not a defeat thereof." *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed. Cir. 1997).

Inline again overlooks to the law. The Federal Circuit rejected a similar attempt to advance a "best design" argument based on general functional design concepts in *Ethicon*. There, the district court had found that the design patents were primarily functional because the claimed design was the "best design" or "preferred" design of those considered for the patentee's commercial product. 796 F.3d at 1331-32. The

Federal Circuit reversed the district court, finding that – like Nestlé's – the choice or preference was not for the particular features of the claimed designs but for the general design concepts that could perform the desired functions. *Id.* ("The district court performed its functionality analysis at too high a level of abstraction, focusing on the general concepts of an open trigger, torque knob, and activation button rather than the ornamental designs adorning these elements.").

Further, given the availability of alternatives, even if there were some aspects of Graphic's claimed designs that had been identified as superior, it would not "render those aspects functional within patent law." *Blackberry Ltd. v. Typo Prods. LLC*, 2014 WL 1318689, at *3 (N.D. Cal. Mar. 28, 2014) (quoting *Richardson v. Stanley Works, Inc.,* 597 F.3d 1288, 1294 (Fed. Cir. 2010)).

For the same reasons, Inline's reliance on the fact that there are utility patents that include figures similar to the Patents-in-Suit is misplaced. Inline Op. Br. at 14. As discussed above, the '078 Patent discloses numerous alternative designs for both the overall claimed designs and Inline's individual elements. Just because the '078 Patent claims general design concepts also found in the Patents-in-Suit, like minor panels, apertures, and closing features, does not demand a conclusion that the appearance of those features is dictated by function. *See Ethicon*, 796 F.3d at 1332 (utility patent's disclosure of general design concepts has no bearing on whether particular appearance of claimed designs were dictated by function).

Likewise, Inline points to the "Crisp and Carry" statement on the front of the commercial products to assert that Nestlé touts the utility of the design. Inline Op. Br. at

14. Again, this is just an argument that the claimed designs perform an underlying function. Totally lacking is any evidence that Nestlé advertises the benefits of the specific appearance of the claimed designs, such as the location or shape of the apertures or the presence of a t-shaped slit and trapezoidal tab. *See Ethicon*, 796 F.3d at 1332 (rejecting district court's reliance on advertisement for commercial product, stating that they "tout the functional benefits of the general design concepts of the underlying elements rather than any functional benefits of the specific claimed designs").

Indeed, as Inline acknowledges, Nestlé's ultimate decision was based on considerations other than whether the chosen sleeve could perform the heating, carrying, and accessing functions, including manufacturing and shipping costs. Inline Op. Br. at 8. Dr. Sand repeatedly refers to factors other than functionality in opining that the individual elements are dictating by function, including packaging and materials costs, production efficiencies, labor, and shipping – all of which relate to the commercialization of embodiments of the claimed designs. Dkt. No. 116, Sand Decl. ¶¶14(c)-(d), 15(d), (f)-(h), and (l), 16(b)-(d) and (f), 18(d)-(e), 19(c)-(d).

These external commercial considerations are not relevant to whether the Patents-in-Suit are primarily functional. The proper test is simply whether alternatives have the "same or similar functional capabilities." *Ethicon*, 796 F.3d at 1331 (quotations and citations omitted). This does not concern whether commercial products depicted in the claimed designs minimize material usage or distribution costs. The Federal Circuit has long held that it is improper to use considerations related to a commercial embodiment to limit the scope of a design patent. *Berry*, 122 F.3d at 1455 ("the court cannot use the

limitations of the commercial embodiment of the underlying article of manufacture to impose limitations on the scope of the design patent").

Even if relevant, Inline and Dr. Sand's positions regarding the impact that altering the claimed designs may have on external commercial considerations are unsubstantiated. Other than Dr. Sand's conclusory statements in her Declaration, there is no evidence to support an assertion that changing the claimed designs would result in anything more than negligible or insignificant impacts on materials, manufacturing, or distribution costs. Floros Resp. Decl. ¶¶35-36, 41-46, 51-54, 59-60, 64-67, 73-74.

## V. INLINE'S BRIEF IMPROPERLY ATTEMPTS TO CONVERT CLAIM CONSTRUCTION INTO SUMMARY JUDGMENT

Inline's Opening Brief reflects an attempt to convert claim construction for design patents into a sprawling, fact-intensive summary judgment inquiry regarding whether the Patents-in-Suit are dictated by function. This is ironic given that it was Inline – in seeking to stay this case pending the '078 IPR – who argued that claim construction in design patent cases is "usually unnecessary." Dkt. No. 44 at 10. It went on to state that "[t]here are, of course, other bases for invalidity besides prior art (such as functionality), but litigating those bases usually is not burdensome." *Id*. at n.4.

The perils of considering Inline's heaps of extrinsic evidence are now apparent: as discussed above, Inline asks the Court to make factual determinations regarding the minutiae of package manufacturing at the claim construction stage. Inline should not be allowed to hijack this proceeding in favor of a full-blown inquiry into functionality until the factual record is fully developed. *See ADC Telecommunications, Inc. v. Panduit*

*Corp.*, 200 F. Supp. 2d 1022, 1033 (D. Minn. 2002); *180s, Inc. v. Gordini U.S.A.*, Inc., 699 F. Supp. 2d 714, 728-30 (D. Md. 2010) (deferring from determining functional aspects of the claimed design until summary judgment or trial); *Vertical Tank, Inc. v. BakerCorp*, 2019 WL 2207668, at *19-20 (E.D. Cal. May 22, 2019) (deferring to determine functionality at claim construction and construing claims as the designs shown in the drawings).

## VI. GRAPHIC'S CONDUCT IN OBTAINING AND ENFORCING THE PATENTS IS LAWFUL AND PROPER

Attempting to paint Graphic as a bad actor, many of the extrinsic "facts" Inline does state are inaccurate attorney argument. Inline attempts to argue that Graphic improperly applied for the design patents because you cannot "apply for overlapping design patent protection on the same functional design" for which a utility patent is obtained. Inline Op. Br. at 2. Inline fails to cite any authority for this proposition, because there is none.

"Both design and utility patents may be obtained on an article if the invention resides both in its utility and ornamental appearance. While utility and design patents afford legally separate protection, the utility and ornamentality of an article may not be easily separable. Articles of manufacture may possess ***both*** functional and ornamental characteristics." U.S. PAT. & TRADEMARK OFF., Manual of Patent Examining Procedure § 1502.01 (9th ed. 2018) (emphasis added); *Design Patent Application Guide*, U.S. PAT. & TRADEMARK OFF., http://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/design-patent-application-guide (last visited June 18, 2019)

(explaining the differences in subject matter between design and utility patents, and noting that "[a]rticles of manufacture may possess both functional and ornamental characteristics"); *see also Lyden v. adidas Am., Inc.*, 2015 WL 758642, at *2 (D. Or. Feb. 20, 2015). Graphic was free to apply for both utility and design patents on same underlying inventions.

Inline attempts to distract focus from the proper analysis through accusations that Graphic engaged in improper conduct by "stealing" the claimed inventions from Nestlé. Inline Op. Br. at 2. Judge Montgomery has rejected this theory, granting Graphic summary judgment on Inline's claim in the Antitrust Case that Graphic procured the patents through fraud by failing to name someone at Nestlé as a co-inventor, stating, "To this day, [no one] at Nestlé claims to be an inventor of the Asserted Patents" and thus Inline has failed to "identify the specific individual or individuals who allegedly co-invented the Asserted Patents." Antitrust Case Dkt. 1035 at 20-21. "Based on the absence of any person claiming to be a co-inventor with Fitzwater of the Asserted Patents, Inline cannot show that an individual associated with the filing or prosecution of the Asserted Patents acted with specific intent to deceive the PTO by failing to name an alleged co-inventor." *Id.* at 21-22.

As Judge Montgomery observed, Graphic had no obligation to inform Nestlé that it applied for the patents or attribute inventorship to some Nestlé employee, especially when each Nestlé employee Inline has mentioned has specifically denied being such. *Id.* at 21 ("Brower testified in his deposition that he does not consider himself an inventor of the '078 Patent. . . . Lou Judge, head of packaging procurement for Nestlé, has testified

that no one at Nestlé claims to be an inventor of the Asserted Patents [and] no current or former Nestlé employee has challenged inventorship before the PTO.").  Thus, not only is Inline's argument that Graphic "stole" the design concepts completely irrelevant to claim construction, it is unsupported and has already been rejected in the Antitrust Case.

## VII.    CONCLUSION

For the reasons stated above, Graphic respectfully requests that the Court adopt its proposed constructions.

Date:  June 21, 2019                    Respectfully submitted,

By:  */s/Felicia J. Boyd*_____
Felicia J. Boyd, MN #186168
**BARNES & THORNBURG LLP**
225 South Sixth Street, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 367-8729
Facsimile: (612) 333-6798
felicia.boyd@btlaw.com

Barry Herman (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
100 Light Street, 26th Floor
Baltimore, MD 21202
Telephone:  (410) 545-5830
Barry.Herman@wbd-us.com

James F. Vaughan (*pro hac vice*)
Christine H. Dupriest (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
271 17th Street, Suite 2400
Atlanta, Georgia 30363
Telephone: (404) 962-7538
James.Vaughan@wbd-us.com
Christine.Dupriest@wbd-us.com

David R. Boaz (*pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone:  (919) 755-8124
David.Boaz@wbd-us.com

*Attorneys for Plaintiff Graphic Packaging*
*International, LLC*